## IN THE

# SUPREME COURT

OF

# NEW JERSEY,

## SEPTEMBER TERM, 1795.

[363]       MOORE v. EXECUTORS OF MOORE.

1. Where one covenants to do specific acts, and no time is fixed within which they are to be done, the utmost time that can be allowed for the performance is during the life of covenantor.

2. In an action of covenant on such a promise, evidence of performance by a bequest in a will is inadmissible in a court of common law.

3. Whether a bequest in a will is to be taken as satisfaction or performance of such covenant is altogether a subject of equity jurisdiction.

4. An instrument may be cancelled either with a view of dissolving existing obligations, or in consequence of performance, and it is the province of the jury to deduce their own inferences from the fact.

5. The plea of *actio non* by the old cases referred to the time of plea pleaded, but now it seems that it refers to the commencement of the action.

6. Where a covenant was to pay £1,000, parol evidence was admitted to show that it was intended that the payment should be made in hard money.

Trial at bar.

This was an action of covenant. The declaration stated that on the 14th of August, 1779, it was convenanted by certain articles of agreement between the testator and the plaintiff, that the testator, for and in consideration of the said articles being received by the plaintiff in full satisfaction of

Moore v. Executors of Moore.

all claims, demands, and accounts against the testator, and his releasing the same, would make to the said plaintiff, who was his son, a good deed for a certain plantation, and would further give him a lease of certain premises, with fire-wood for the use of the same, for four years—and two cows and two horses, one-half of all his household furniture; and further would give to the plaintiff £1000 in money and provisions to maintain his family for one year—and then lays a general breach of all the covenants.

The defendants pleaded—1st. That the testator in his lifetime, after the date of the articles, did give two horses, £1000 and the other articles, specifying them.

2d. That the testator in his lifetime, viz., on the 1st September, 1786, paid to the plaintiff £1000 according to the articles.

3d. That the executors, after the death of the testator, viz., on the 1st of September, 1787, paid the said £1000.

Annexed to these pleas was a notice of set-off, of which the 6th and 7th articles only were introduced into the argument, under the plea of payment by the testator.

The 6th notice was, that in support of the plea of payment by the testator, the defendants would give in evidence divers legacies and bequests of money, goods and chattels to the value of £6000, given to and accepted by the plaintiff under the testator's will, dated August 2d, 1783, in discharge of the said £1000, &c.

[364] 7th. Notice.—That on the 1st of September, 1786, the counterpart of the agreement sued upon, in the hands of the testator, was cancelled with the knowledge and assent of the plaintiff, and in his presence.

*Leake* and *Aa. Odgen*, for the defendants, opened, that the testator died on the 5th of September, 1786; that by his last will and testament, dated the 2d of August, 1783, he had given and bequeathed to the plaintiff lands, goods and chattels to the full value of the money and articles covenanted

2 D

to be given by the deed of 1779, which had been delivered by the executors, and accepted by the plaintiff; and offered evidence to prove these facts to the jury under the plea of performance by the testator, or payment by the executors. They further offered to prove that the identical horses and cows covenanted to be delivered were bequeathed in the will and delivered to the plaintiff.

*R. Stockton* and *Frelinghuysen*, for the plaintiff, objected to the admission of the testimony upon two grounds.

1st. It does not pursue and prove the issues taken upon the breaches assigned in the declaration, viz., performance by the testator in his lifetime, or payment by the executors since his death.

2d. It is inadmissible evidence in a court of common law, under any plea whatsoever.

On the first ground they contended that the evidence offered to support the plea of performance by the testator in his lifetime, carried with it a most singular inconsistency, and seemed equally at variance with the language of common sense and the rules of pleading. The declaration had stated certain·covenants made on the 14th of August, 1779, which from the acknowledged terms of the instrument should have been performed at least in the lifetime of the testator—that breaches had been assigned in the non-performance of these covenants by the testator in his lifetime on request. The plea of the defendants, after craving oyer of the articles, had explicitly admitted this construction of the covenants, (namely, that they were to be performed in the lifetime of the testator) by confessing their legal operation as stated in the de-[365]-claration, and averring a precise performance of them. Could anything wear a more singular aspect in a court of law, than to offer to prove the execution of a contract by the testator in his lifetime, from an instrument which had no validity nor legal operation until after his death ; and by provisions, under which it could not, for a certain period, and might not for a remote one, benefit the plaintiff? They cited the case of *Dunham* v. *Adm'r of Hadden,* decided at the last

Burlington Assizes, in which it was held that under a plea of payment by testator, payment by the executors was inadmissible evidence. On the whole, the evidence offered, so far from establishing the plea, was irreconcilably at variance with it, and, in fact, confessed the breach as laid in the declaration.

With regard to the plea of payment by the executors since the death of the testator, they contended—1st. That the will, as stated by the counsel, did not include the bequest of any money whatever to the plaintiff, nor was it pretended that the executors under the will had paid him any. 2d. That under the plea of payment, the executors could be permitted to show only a strict payment of money in discharge of the covenant broken ; or, under the notice, to set-off a counter demand of the testator. In neither point of view did the will, or the execution of· it by the executor, support this plea. In the light of strict payment, it was impossible seriously to contend for it. The executors merely executed a trust raised by the will ; they assented to and delivered the specific legacies given by the testator to the plaintiff; and as these bequests were not expressly given in satisfaction of debts, the executors could have neither pretence nor right to annex a condition or qualification which the testator had not created. They had done no more than to put the plaintiff in possession of property in which he had acquired a vested interest under the will.

Considering it in the light of a set-off, the proposition contended for by the defendant would appear still more untenable. A set-off, under the " act for preventing multiplicity of actions," passed May 5th, 1722, (*Allinson's Laws* 66, 67,) as is evident, both [366] from the preamble and enacting clause, is limited to dealings and contracts between parties upon which a balance of debt arises in favor of the one or the other. The words of the first section are, " If any two or more dealing together, or having dealt together, be indebted to each other upon bonds, bills, bargains, promises, accounts, or the like, &c., if defendant cannot gainsay the deed, &c., he may plead payment, and give notice with the said plea of what he will insist on at the trial by any bond, bill, receipt,

account, or bargain, or else forever be barred of bringing any action for that which he might or ought to have pleaded, by virtue of this act." From these words, and from the avowed design of the law as exhibited in the title, it is manifest that nothing can be the subject matter of a set-off within the intentions of the legislature, but an actual subsisting debt; a debt upon which a cross action could have been maintained before the passing of the act. The argument for the defendant was in fact bottomed upon and terminated in these propositions—that a testator, by the gift of an unconditional legacy to his creditor, raised a debt against him—and that the executors could have maintained a suit against the plaintiff for the property given to him under the will of their testator.

It is further to be observed, upon this plea of payment by the executors and set-off, that no plea of payment could be pleaded to a single obligation, without an acquittance under seal. The debt is raised immediately upon the execution of the instrument, and can be discharged only by matter of as high a nature. *Blake's case*, 6 *Rep.* 44; *Preston* v. *Christmas*, 2 *Wils.* 86. This latter case went even further, and proved that the defendants could not have pleaded the acceptance of the legacies, even by way of accord and satisfaction, without deed. If, therefore, the facts which are offered to be proved are admissible under any plea that might have been framed, they clearly are not so in the present case.

2d. But the evidence proposed creates no legal defence, under any form of pleading, and therefore is clearly inadmissible. The construction put upon these articles by the defendant is, that the whole instrument, taken together, should [367] be construed into covenants by way of provision or portion for a child, and if so, the bequests and devises to the son in the will amounted to a complete equivalent, and ought to go in satisfaction of the covenants. But, in the first place, there is nothing in the instrument which warrants such a construction. Every part of it shows clearly that there was a legal contract between Alexander Moore, the father, and Alexander Moore, the son, for a valuable consideration, to be

performed *in præsenti*, forming a mutual obligation, and creating, immediately, and in the strict sense of the phrase, a debt. The preamble to the instrument, and the consideration specified, show abundantly that it was not intended to secure to the plaintiff a bounty or portion from his father, but carried, on the face of the instrument, what it in fact purported to be, a composition for actually subsisting claims and demands. The mere mention of the connection which existed between the parties, affords no ground for drawing an inference of so important a nature; it is to be regarded as a description of the persons (they having the same name) between whom the agreement was made.

Nor can the language of the instrument, where the testator covenants to *give* a lease, to *give* £1000, justify the interpretation which it has been attempted to fix upon it. This word does not, when employed in legal instruments, necessarily denote a mere bounty; but is usually inserted in deeds and conveyances where the consideration precedes the transfer of the property. It comes precisely within one class of contracts mentioned by *Blackstone, facio ut des.* 2 *Bl. Com.* 445. The plaintiff releases in consideration that the testator should give.

But in the law, the word gĭve, independently of a consideration expressed, is amply sufficient to create a debt. " These words, ' I am content to give to W. £10,' amount to an obligation and an express engagement to pay." 5 *Bac. Abr.* 158, *title " Obligations," B*, which authority goes further than the case before the court.

If the court were satisfied that this covenant was sufficient to raise a strict debt or duty, upon which an action could have been maintained against the testator in his lifetime, it [368] would not be difficult to show that neither in law nor in equity could general legacies or bequests in a will amount to a satisfaction. The case of *Goodfellow* v. *Burchett*, 2 *Vern.* 298, is stronger than the present. There one Trill, on the marriage of his daughter with the defendant, gave him a bond for part of the portion; he afterwards devised lands to

his son-in-law, his wife and their heirs, of much greater value than the debt. Yet the court, although creditors were concerned, would not for a moment yield to the idea that the devise was to be considered as a satisfaction of the bond, though there were a deficiency of assets.

Supposing for an instant, however, that this was a mere gift to the son, and by way of provision or portion, then, secondly, it was not competent for a court of law to admit in satisfaction of express covenants a collateral compensation, a peformance by will, even if it clearly appeared that it was so intended.

It was true that courts of equity had sometimes assumed a jurisdiction in certain cases, and had decreed legacies and devises as satisfaction of debts or covenants when the money given or the thing devised agreed in every respect with the money to be paid or the act to be performed under the contract. But this was only in cases where the court thought themselves entitled to infer from undoubted circumstances that such was the intention of the testator. So in cases of portion or provision for children, under circumstances leading to the same belief, those courts had decreed a provision by will to have the effect of payment or performance, though in some respects differing from the covenants if equally beneficial.

These powers, however, had never been assumed by any other than courts vested with chancery powers, and even with regard to them it has been thought that they have carried their doctrines upon this subject too far; and they have of late been inclined against considering legacies as a satisfaction, because, to use the language of Lord Hardwicke, "legacies naturally imply a bounty." 3 Atk. 97.

[369] No cases can be shown where courts of law have adopted the language and doctrines of courts of equity with regard to collateral satisfactions. In Hargrave's, Co. Litt. 366, n. 1, it is said collateral satisfactions at law are not a bar of dower—the remedy is purely equitable; and so it is here. If the interpretation for which the defendant contends can be

supported by testimony, the Court of Chancery is the proper tribunal before which to bring the question ; but the admission of such testimony as is now offered, the entering into such questions as are now proposed, by a court of law, would unsettle the most indubitable and the longest-established legal principles.

*Leake* and *Ogden, contra,* contended that the question as to the effect of the evidence proposed was not regularly before the court, upon an objection which went to resist its admission. Testimony is inadmissible in a court of justice where it flows from an interested or a criminal source, or where the policy of the law or the want of some legal formality renders its introduction improper ; but if not thus tainted, it should be heard, and its legal operation should be a matter for the after consideration of the court and jury. This rule should more especially be observed in cases of written testimony, where the writings should always be proved before the effect of them can come under consideration. This has been distinctly settled in the case of a deed, (a) not upon the principle of its having a piece of wax attached to it, but because whether it supported the issue or not, was a question which could be best determined after the contents were read in evidence to the jury.

Between a deed and any other written instrument it would be difficult to establish a distinction ; and if it should be con-[370]-tended that the seal constitutes the difference, an answer would be afforded by the fact that in this case the will actually had a seal, was attested by three witnesses, and was, therefore, as solemn an instrument as could be framed.

(a) In the case of *Shrider's lessee* v. *Nargan,* 1 *Dall.* 68–9, McKean, C. J., is reported to have said: "We cannot hinder the reading of a deed under seal, but what use will be made of it is another thing." And in the case of *M'Dill* v. *M'Dill, 1 b.* 74, it is said: "Any deed under seal, when proved, is proper to be given in evidence." In *Faulkner* v. *Eddy,* 1 *Binney* 188, it is said that "in these cases (from *Dallas,*) the law was carried too far," and that a deed is not admissible in evidence until at least a shadow of title is shown in the grantor.

Courts should never, except in cases of the last extremity, or when it is to avoid manifest attempts to mislead or delay, entertain these exceptions to the admissibility of evidence. Too much light can rarely be thrown upon a litigated question, and if it should be tinctured by the medium through which it passes, it is within the province and capacity of a jury to detect the error or the deception. Objections of this kind have a tendency to throw too much power into the hands of the court, and to infringe upon the clearly defined rights of juries. Juries have a right, if they think it proper, to reject the opinion of the court upon the law, and in every case to give a general verdict. This right, which unquestionably belongs to them, if it does not afford a sufficient ground to overturn all exceptions of this nature, should at least be so far considered by the court as to prevent them, when not absolutely bound by preceding decisions, from closing to the jury any of the avenues to the truth, and subjecting their high privileges to the mercy of the court.

2d. Admitting, however, that the question was properly before the court, they contended—1st. That the evidence offered coincided sufficiently with the plea of performance by the testator in his lifetime. It was a covenant to give; neither the time when nor the manner in which it was to be effected was specified. It appears that, four years after the execution of the covenant, he actually publishes his last will, under which a disposition of his property was made, similar to that which he had engaged to make, and this will was never revoked.

Supposing that the bequests in the will amounted to a performance of the original covenants, there appeared nothing at variance either with the rules of pleading or common sense in averring the performance to be made in the lifetime of the testator. So far as it was the act of the testator it was executed while he was alive, and though its operation was not complete until consummated by his death, yet it had its in-[371]-ception at a previous period. It is undeniable, that to

some purposes, a will has relation to the time of its execution, which it becomes as material to fix as the date of any other instrument. Although it is necessary that the death of the testator should give complete effect to this species of instrument, yet the disposition of the estate is literally made during his life.

If the evidence did not precisely accord with the plea, this was to be attributed rather to the nature of the instrument to which reference was to be made, than to any defect in the mode of drawing the plea. It could not be pleaded that the executors had performed the covenants, because, unless the will amounted to a compliance with the terms of the covenant, their acts, as executors, could not supply the deficiency. If the plea had stated that the testator had performed after his death, or by the act of dying, far more room would have been found for exciting the smiles of the court than the present mode has afforded. The plea was intended to state that the testator himself performed, and the words, " in his lifetime," are to be considered rather as legal formality or technical inference, than anything substantial.

2d. If the forms of pleading would allow of the admission of the evidence, then the evidence itself furnished a good and legal defence to the action. This depended upon two considerations, which constituted the grounds of the plaintiff's objection—first, the construction of the articles; secondly, the jurisdiction of the court, or, more properly speaking, its capacity to do justice.

First. On the construction of the instrument, it was on the face of it, manifestly, a voluntary and gratuitous settlement upon a son. The phraseology employed, and the nature of the provisions, lead directly to that conclusion. It is stated to be a covenant between father and son—no pecuniary consideration is expressed; and with respect to the son's releasing his claims, &c., it unquestionably had reference to any future demands upon his father's estate, as heir-at-law. The nature of the provisions clearly corroborates this interpretation. He gives his son a farm, half his furniture, provi-

sions for his family for a year, fire-wood for four years,
[372] horses, cows, &c. These are precisely what a father
might be expected to give his son as an outfit, and they tend
to strengthen the idea that they were so intended.

If, by the term, "strict debt," the plaintiff's counsel meant
to imply that, under these articles, an action of covenant or
debt might have been maintained against the testator in his
lifetime, there is no intention or wish to dispute the correct-
ness of their judgment. If, however, it was intended to
assert that the covenants were entered into for value received,
or for any valuable consideration whatever, the case is alto-
gether different. The law cited from Bacon is not denied.
Covenant or debt might have been maintained, but the cove-
nantee did not elect to pursue this course, and the covenantor
has given, by his will, what amounts to a full performance
of the benefit intended by the original articles, if they are
considered as securing a portion.

With regard to the principle that there can be no collateral
satisfaction for the breach of an express covenant, it is con-
tradicted by cases of undisputed authority. Lord Hardwicke
found fault only with the too common error of pushing a
correct doctrine to an extravagant excess, and not with the
principle itself. In the cases of *Blandy* v. *Widmore*, 1 *P.
Wms.* 324, and *Wilcocks* v. *Wilcocks*, 2 *Vern.* 558, the doc-
trine for which we contend is recognized to the full extent
of our wishes, and even further, for they prove that an estate
thrown upon a covenantee by the act of law, should go in
satisfaction of an express covenant.

It has, however, been contended, that whatever may have
been the decisions in equity upon questions of this nature, it
does not come within the powers of a court of common law
to examine, under the plea of performance, into those cir-
cumstances which, in equity, might be considered as a com-
plete performance and satisfaction of the express under-
taking.

Upon this question, it may be observed, that in the action
of covenant, there being, strictly speaking, no general issue,

the plea of performance, which approaches as near to it as possible, ought to be considered as analogous to the general [373] issue, which, according to *Blackstone, 3 Com.* 306, " leaves everything open, the fact, the law, and the equity of the case." Under the plea of *non assumpsit* anything which shows that *ex equo et bono*, the plaintiff is not entitled to recover, may be given in evidence, as payment, usury, duress, nonage, &c. Upon what ground, then, are we prevented from introducing an instrument, the operation of which is to preclude the plaintiff from recovering, by showing that he has sustained no inconvenience or damage?

But an action of covenant is an action for damages, and the damages to be recovered should be proportionate to the actual injury received. It is, therefore, of extreme importance that this evidence should be received upon the principle that whatever tends to diminish the damages, though it does not entirely destroy the demand, is admissible in testimony. It would be unnecessary to cite cases for the purpose of proving this doctrine, and that it is uniformly acted upon in actions of assault, slander, actions *per quod*, which in effect differ in no respect from the present case.

There are circumstances in this case which most conclusively show the necessity of such a rule, and would almost justify a court in introducing it, without any precedent or analogous case to warrant it. We have offered to prove that some of the identical articles, which by the articles were covenanted to be conveyed, were actually bequeathed by the will, and have, in fact, been delivered to the plaintiff. Is it to be allowed that he shall recover damages for the non-delivery of these articles, when, in fact, they have been delivered ? In trover, the defendant is always permitted to prove the return or recaption of the goods, in mitigation of damages; and with that view, if in no other, the present evidence should be received.

There is, however, no rule of law or technical nicety which prevents this court from receiving the evidence which we have offered in bar of the plaintiff's action. Such a per-

formance, if designated as such, though not a literal compliance with the terms of the covenant, is sufficient; and whether it was intended so to operate, whether it is equal in value, are questions which a court and jury are, to say the least, as competent to decide as any Chancellor.

[374] It becomes those who aim to limit the jurisdiction of this court, to substantiate their exceptions by some clear and decisive authority.   It is acknowledged that if our interpretation be correct, there is a tribunal from which we may receive justice, and as it does not appear that upon principle there is any objection to the jurisdiction of this court, the mere showing that courts of equity have assumed cognizance of such causes, is not sufficient to prove their jurisdiction exclusive.   A court of law possesses all the means of coming at the justice of a case, which a court of equity can command : and as we did not make choice of this tribunal, but were brought into it, it ought surely to be allowed us to make our defence here.

In the case of *Read* v. *Brookman*, 3 *T. R.* 151, it was determined that the obligee need not go into equity, in case of a lost bond.   This case was afterwards cited in *Atkinson* v. *Leonard*, 3 *Br. Ch. Rep.* 218, in chancery, when Lord Chancellor Thurlow remarked that " it does not follow because the court of law will give relief, that this court loses its concurrent jurisdiction."   This was a precedent where what is warmly called an invasion of the peculiar jurisdiction of the courts of equity, was made, without producing any inconveniences, and without exciting any unpleasant feelings on the part of those whose rights were thus infringed.

Courts of common law have, of late years, repeatedly extended redress beyond the ancient limits of the law, and have adopted this rule for their government, never to send suitors into another court, if justice can be done as well in their own. The language of Lord Kenyon, which Buller calls " sound and manly," is " that where he found justice and honesty on the side of a plaintiff here, he would never turn him round

in order to give him the chance of getting justice elsewhere."
4 *T. R.* 343, *Master* v. *Miller.*

KINSEY, C. J.

This will cannot be received in evidence; we are bound
by the rules of law, and they offer insurmountable objections.
The utmost time within which, by law, the testator was allow-
ed to perform these covenants, was during his own life: and
[375] in this respect the evidence does not support the plea
of performance.

But we are clear that whether the contents of the will are
to be regarded as a satisfaction, or performance of the origi-
nal articles, is exclusively a subject of equitable jurisdiction.
The constitution has not vested this court with power to de-
cree covenants performed by general devises in a will to the
covenantee. Whether such bequests ought, *ex equo*, to go in
part or entire satisfaction of express covenants in a deed, can-
not be the subject of a legal discretion; it must be referred
altogether and entirely to the court of equity.

The defendants then offered to prove that there were two
parts of the articles declared on, and that at a certain time,
the plaintiff being at the house of the testator, the latter pro-
duced his part, which, with the assent of the plaintiff, and in
his presence, was cancelled and destroyed by Dr. Harris, one
of the defendants.

The counsel for the plaintiff objected to the testimony.
They contended that the covenant, which was in the possession
of the plaintiff, had been produced, and appeared not to be
cancelled, and that it did not appear, because the other party
had destroyed his, that, therefore, the whole contract was at
an end.

But there had been in this case a plea of performance,
which admitted the existence of the articles at the time of
pleading; the evidence offered was, therefore, in contradiction
to the admission of the party tendering it. The defendant, if
he really had such a ground of defence, ought to have pleaded

*non est factum.* Under the plea of payment in an action on a bond, it would not be permitted to prove that the obligation had been cancelled before action brought.

Lastly, if this evidence can have any operation it must be by proving the fact of satisfaction, which should have been specially pleaded, and cannot be given in evidence under this plea.

The counsel for the defendant argued, in answer to the first objection, that both parts made but one instrument, and that [376] if either was cancelled, with the consent of the parties to it, both were at an end.

With regard to the second and third objections they said that although cancellation did not absolutely prove performance, yet it was evidence from which performance might be inferred by the jury, and was therefore proper to go to them.

PER CUR. The cancellation of an instrument may be considered as evidence, either that an existing obligation had been destroyed, or that it had been actually performed. If it was cancelled in consequence of performance, it is unquestionably evidence of that fact. The jury must draw their own inferences.

The Chief Justice observed during this argument that according to the old cases the plea of *actio non* had reference to the time of pleading; but that according to the modern decisions it referred to the commencement of the action. See 1 *Selwyn's N. P.* 137.

The plaintiff then offered to prove by one of the subscribing witnesses to the articles, who was the person that actually drew them, that the testator intended that the £1000 given generally, should be paid in specie. The evidence was objected to, on the ground that it was to alter the nature of the instrument; that the money given must be considered as the legal and current money of the time, but the objection was

overruled by the court, who said that it was a case of *ambiguitas latens;* that the testimony was intended to show the actual meaning of the instrument, and not to vary or contradict it, and the evidence was admitted. (*a*)

The jury in this case had agreed upon a verdict for defendant, but the plaintiff suffered a nonsuit.

(*a*) See a decision of the Supreme Court of Vermont, to the same purport, in the case of *Morton* v. *Wells,* 1 *Tyler* 382.